UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X
                                                           :
BMC-THE BENCHMARK MANAGEMENT   :
COMPANY d/b/a BENCHMARK                   :
HOSPITALITY INTERNATIONAL,                :
                                                           :
                          Plaintiff,              :
                                                           :
            -v-                                            :
                                                           :
V3 231, LLC f/k/a 229-231 DUFFIELD     :
STREET L.L.C.,                                    :
                                                           :
                          Defendant.           :
                                                           :
-----------------------------------------------------------X

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  SEP 27 2013

No. 12 Civ. 7921 (RA)

OPINION AND ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiff BMC-The Benchmark Management Company ("Benchmark") brings this diversity action against V3 231, LLC ("V3") for breach of contract and breach of the implied duty of good faith and fair dealing. Benchmark and V3 entered into two contracts pursuant to which Benchmark would provide hotel management services for a hotel that V3 was to construct and own located at 231 Duffield Street, Brooklyn, New York (the "Hotel"). The gravamen of Benchmark's complaint is that V3 breached these contracts when it sold the Hotel to a third party and terminated the agreements. Before the Court are V3's motion to dismiss and motion for summary judgment, Benchmark's cross-motion for partial summary judgment, and Benchmark's motion to strike portions of an affidavit submitted by V3 in support of its motion. For the reasons set forth below, V3's motion is granted as to Count Three (breach of the implied duty of good faith and fair dealing) but denied as to the other claims. Benchmark's cross-motion is denied as to all claims, and its motion to strike is denied as moot.

I.      **Background**[1]

Benchmark is a corporation that provides hospitality services to resorts and hotels.  (Pl. 56.1 ¶ 1.)  V3 is a limited liability company that purchased the parcel of land upon which the Hotel was to be constructed.  (Id. ¶ 3.)

A.      **The Agreements**

On February 17, 2011, the parties entered into the two agreements at issue.  (Id. ¶ 4.)  In the first agreement, entitled "Pre-Opening Services Agreement" (the "Pre-Opening Agreement"), the parties agreed that Benchmark would provide V3 with certain enumerated services prior to the Hotel's opening.  (Id. ¶ 5.)  A second agreement, entitled "Hotel Management Agreement" (the "Management Agreement") provided that, upon the opening of the Hotel, Benchmark would operate and manage the Hotel for a ten-year period, with two five-year renewal terms thereafter. (Id. ¶ 6.)   New York law governed both agreements.   (Pre-Opening Agreement § 11.1; Management Agreement § 16.10.)

1.      **The Pre-Opening Agreement**

The Pre-Opening Agreement was effective February 17, 2011, and required Benchmark to provide V3 with certain services, such as administrative support, hotel design, marketing, and food and beverage facilities planning, prior to the Hotel's opening.  (Pl. 56.1 ¶¶ 7-8.)  In return, V3 agreed to pay Benchmark $12,500 per month during the term of the Agreement.  (Pre-Opening Agreement § 5.1.)  V3 also agreed to reimburse Benchmark for certain pre-opening expenses, such as employees' salaries, marketing costs, and professional fees.  (Id. §§ 2.3, 6.1-

---

[1]      The following facts are drawn from the pleadings, Defendant's Statement of Material Undisputed Facts Supporting V3's Motion for Summary Judgment ("Def. 56.1"), the affidavit of Abraham Pasternak dated December 10, 2012 ("Pasternak Aff.") and the exhibits attached thereto, Plaintiff's Statement of Undisputed Facts Pursuant to Local Civ. R. 56.1 ("Pl. 56.1"), and the Declaration of Alex Cabañas dated January 4, 2013 ("Cabañas Decl.") and the exhibits attached thereto.  The facts are undisputed unless otherwise noted.  Where one party's 56.1 Statement is cited, the other party does not dispute the fact asserted or has offered no admissible evidence to refute that fact.

6.2.)

Section Ten of the Pre-Opening agreement defined several "Events of Termination," each of which permitted termination of the agreement. (Id. § 10.2.) One such provision, entitled "Economic Viability," provided that "[i]f Owner in its sole discretion determines the Project is not economically viable, Owner may terminate the development of the Project with the result that both this Agreement and the Hotel Management Agreement will terminate." (Id. § 10.2.12.) If V3 invoked this provision to terminate the Agreement, it was obligated to wait two years before engaging in a "development substantially similar to the Project," unless it paid a defined amount "as a lump sum buyout fee for both contracts." (Id.) The Pre-Opening Agreement also required V3, upon termination of the Agreement, to reimburse Benchmark for any outstanding expenses and to pay other fees. (Id. § 10.5.) A separate provision of the Pre-Opening Agreement reiterated that termination under this section would terminate both the Pre-Opening Agreement and the Management Agreement. (Id. § 4.1 ("The Hotel Management Agreement will become effective on the Opening Date pursuant to its own terms on the Opening Date, unless there was an early termination of this Agreement by Owner . . . pursuant to the provisions of Section 10 below.").)

## 2. The Management Agreement

The Management Agreement provided that Benchmark would operate and manage the Hotel for an initial term of ten years commencing on the Hotel's "Opening Date," defined as "the date the Project is formally opened for business, or, the date Operator begins operating the Project, if the Project was previously in operation." (Management Agreement §§ 1.29, 3.1.) Benchmark's compensation under the Agreement was tied to the Hotel's revenue and profitability. (See id. § 5.1.)

As did the Pre-Opening Agreement, the Management Agreement outlined the circumstances in which the parties could terminate the Agreement. According to the Management Agreement, V3 had the option to terminate the agreement if it "s[old], assign[ed], transfer[ed] or otherwise dispose[d] of [its] title in the Building and the Site to any third party," provided V3 gave Benchmark at least seventy days' notice. (Id. § 12.1(e).) Termination under this provision potentially required V3 to pay a "Termination Payment," described below. Unlike the Pre-Opening Agreement, the Management Agreement did not contain any language permitting termination if V3 determined that development of the Hotel was not economically viable.

**B.      The First Termination Letter and the Management Agreement Addendum**

By letter dated December 29, 2011 ("First Termination Notice"), V3 informed Benchmark that it was terminating the Pre-Opening and Management Agreements. (Cabañas Decl. Ex. 3.) The First Termination Notice stated that V3 "ha[d] determined in its sole discretion that the Project is not economically viable." (Id.) Benchmark disputed the validity of the First Termination Notice, asserting that the project was economically viable. (Pl. 56.1 ¶ 27.)

To resolve this dispute, the parties entered into an amendment to the Management Agreement, dated March 26, 2012 (the "Addendum"). (Cabañas Decl. Ex. 4.) The Addendum stated that "Owner has been in the process of trying to sell some or all of its interest in the Project," (id. at 1), and retracted the First Termination notice, calling it "null and void." (id. ¶ 2.) The Addendum also amended Section 12.4 of the Management Agreement, which pertained to the "Termination Payment," to read:

> Termination Payment.  If this Agreement is terminated pursuant to [Section 12.1(e), addressing sale of the Hotel, as well as other Sections not relevant here] in addition to all other remedies to which Operator may be entitled, Owner shall pay Operator the applicable Termination Payment as set forth below opposite the

year of termination, with such payments immediately due on the Termination Date:

| Year of Termination | Base Termination Payment | Additional Termination Payment | Total Maximum Termination Payment |
|---|---|---|---|
| Year 1 through 2 | $350,000 | 25% of the Sale Net Profit up to a maximum Additional Termination Payment of $350,000 | $700,000 |
| Year 3 | $200,000 | 25% of the Sale Net Profit up to a maximum Additional Termination Payment of $500,000 | $700,000 |
| Year 4 | $100,000 | 25% of the Sale Net Profit up to a maximum Additional Termination Payment of $500,000 | $600,000 |
| Year 5 | $100,000 | 25% of the Sale Net Profit up to a maximum Additional Termination Payment of $400,000 | $500,000 |
| Year 6 | $100,000 | 25% of the Sale Net Profit up to a maximum Additional Termination Payment of $300,000 | $400,000 |
| Year 7 | $100,000 | 25% of the Sale Net Profit up to a maximum Additional | $300,000 |

| | | | |
|---|---|---|---|
| | | Termination Payment of $200,000 | |
| Year 8 | $100,000 | 25% of the Sale Net Profit up to a maximum Additional Termination Payment of $100,000 | $200,000 |
| Year 9 | $100,000 | No Additional Termination Payment | $100,000 |
| Year 10 | $100,000 | No Additional Termination Payment | $100,000 |

The applicable Termination Payment will equal the amount of the Base Termination Payment; provided, however, the applicable Termination Payment will be subject to and capped at the applicable Total Maximum Termination Payment as described in the chart above.  For purpose of this Section 12.4, the "Year of Termination" shall refer to each applicable twelve month period constituting a contract year of the Original Term as defined in Section 3.1 commencing on the Opening Date.

(Id. at 1-2.)

## C.     The Second Termination Letter and the Sale of the Property

On June 8, 2012, V3 sold the yet-unopened Hotel and the land on which it was built to a third party.  (Pl. 56.1 ¶ 33.)  V3 did not assign its interest in the Management Agreement to the purchaser, nor did it provide Benchmark with notice of the sale.  (Pl. 56.1 ¶¶ 35-36.)  On the same date, V3 sent Benchmark a letter purporting to terminate the Pre-Opening Agreement and the Management Agreement, stating that "Owner previously determined in its sole discretion that the Project is not economically viable and has elected to sell the Building and Site."  (Cabañas Decl. Ex. 5.)

### D.      The Settlement Agreement

On July 20, 2012, Benchmark and V3 entered into an agreement entitled "Settlement Agreement and Partial Release" ("Settlement Agreement").  The Settlement Agreement stated that it aimed to resolve the "dispute . . . between V3 and [Benchmark] concerning the appropriateness of certain of the amounts or payments included in the BMC Claims" (the "Dispute").  (Settlement Agreement at 1.)  The Agreement defined "BMC Claims" as "certain paid-time off . . . and severance expenses" Benchmark had incurred "as a result of the . . . termination of the [Pre-Operating Agreement] which were paid or owed to [Benchmark's] employees."  (Id.)

Pursuant to the Settlement Agreement, Benchmark agreed to release V3 from "suits at law or in equity, including claims or suits for contribution and/or indemnity, and all consequential damages they have or may have related to the BMC Claims and the Dispute, whether or not they are aware of any such claim."  (Id. ¶ 4.2.)  Paragraph 4.3 of the Settlement Agreement clarified that the release did not apply to the "Open Claim," which was defined as Benchmark's "claim for the Termination Fee and all counterclaims of V3."  (Id. ¶¶ 2.3, 4.3.)

## II.      Procedural History

Benchmark filed this action on October 24, 2012, and filed an amended complaint on November 26, 2012.  The amended complaint alleges breach of contract based on the termination of the Pre-Operating Agreement (Count One); breach of contract based on the termination of the Management Agreement (Count Two); and breach of the implied duty of good faith and fair dealing (Count Three).  The amended complaint also seeks a declaration that the Second Termination Notice did not terminate either the Pre-Opening Agreement or the Management Agreement (Count Four).

On December 11, 2012, V3 filed a motion to dismiss Benchmark's complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 56(c).  Benchmark, for its part, filed a cross-motion for partial summary judgment on January 4, 2013.  Benchmark also filed a motion to strike portions of the Affidavit of Abraham Pasternak, alleging that they violated Federal Rule of Civil Procedure 56(c)(4).

## III.   Standard of Review

"If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d); Hernandez v. Coffey, 582 F.3d 303, 307 (2d Cir. 2009).  Because both parties have submitted evidence relating to matters outside the complaint, the Court treats the pending motions as motions for summary judgment.[2]

Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "The moving party bears the burden of establishing the absence of any genuine issue of material fact."  Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010). "All ambiguities must be resolved in favor of the non-moving party and all permissible inferences from the factual record must be drawn in that party's favor."  Id.  On cross-motions for summary judgment, the Court need not "grant judgment as a matter of law for one side or the other," but instead "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under

---

[2]       A district court must ordinarily give notice to the parties before converting a motion to dismiss into a motion for summary judgment, but a party "is deemed to have notice that a motion may be converted . . . if that party should reasonably have recognized the possibility that such a conversion would occur."  Sira v. Morton, 380 F.3d 57, 68 (2d Cir. 2004) .  Here, V3 jointly filed a motion to dismiss pursuant to Rule 12(b)(6) and a motion for summary judgment pursuant to Rule 56.  Benchmark then responded with an opposition to V3's motion and a cross-motion for summary judgment.  Both parties submitted extrinsic evidence and Rule 56.1 statements along with their memoranda of law.  Under these circumstances, it is clear that both parties had notice that the motion may be treated as one for summary judgment.

consideration." Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993).

## IV.  Discussion

The Court first addresses Benchmark's two breach of contract claims.  As noted above, New York law governs both contracts.

To prevail on a breach of contract claim under New York law, the plaintiff must establish "(1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." Fischer & Mandell, LLP v. Citibank, N.A., 632 F.3d 793, 799 (2d Cir. 2011). The "fundamental objective of contract interpretation is to give effect to the expressed intentions of the parties." Lockheed Martin Corp. v. Retail Holdings, N.V., 639 F.3d 63, 69 (2d Cir. 2011). When the parties dispute the meaning of a contract—as is the case here—the "threshold question is whether the contract is ambiguous," which "is determined by looking within the four corners of the document, not to outside sources." Id. "A written agreement that is clear, complete and subject to only one reasonable interpretation must be enforced according to the plain meaning of the language chosen by the contracting parties." Brad H. v. City of New York, 17 N.Y.3d 180, 185 (2011).  When the contract is unambiguous, summary judgment is appropriate. Topps Co. v. Cadbury Stani S.A.I.C., 526 F.3d 63, 68 (2d Cir. 2008).

Generally, "when the meaning of the contract is ambiguous and the intent of the parties becomes a matter of inquiry, a question of fact is presented which cannot be resolved on a motion for summary judgment." Postlewaite v. McGraw-Hill, Inc., 411 F.3d 63, 67 (2d Cir. 2005).  Summary judgment is appropriate, however, "if the ambiguities may be resolved through extrinsic evidence that is itself capable of only one interpretation." Topps, 526 F.3d at 68.

### A.      Breach of Contract: Pre-Operating Agreement

Each party asserts that it is entitled to summary judgment on Count One.  The Court must

first consider whether Benchmark's claim for breach of the Pre-Operating Agreement is barred by the Settlement Agreement. If it is not, the then Court must consider whether V3 breached the Pre-Operating Agreement as Benchmark alleges.

### 1.    Whether the Settlement Agreement Bars the Claim

V3 argues that the Settlement Agreement's release encompasses Benchmark's claim and that Benchmark's claim is thus barred. Benchmark, however, asserts that the Settlement Agreement is limited to Benchmark's claims for reimbursement of paid time off and severance expenses and does not affect the instant action.

The Settlement Agreement is governed by New Jersey law. (Settlement Agreement ¶ 8.1.) Under New Jersey law, "settlements are contracts" and "general principles of contract law apply." New Jersey Mfrs. v. O'Connell, 300 N.J. Super 1, 7 (N.J. Super. Ct. App. Div. 1997). As is the case under New York law, under New Jersey law, the Court "first must make the determination of whether the contractual term at issue is clear or ambiguous.'" Doynow Sales Assocs., Inc. v. Rocheux Int'l of N.J., Inc., 647 F. Supp. 2d 296, 306 (S.D.N.Y. 2009) (quoting Vanguard Prop. Grp., Inc. v. Trocki, 2009 WL 465534, at *5 (N.J. Super. Ct. App. Div. Feb 26, 2009). If "the terms of a contract are clear and unambiguous there is no room for interpretation or construction," and the court "must enforce those terms as written." Karl's Sales & Serv., Inc. v. Gimbel Bros., Inc., 249 N.J. Super 487, 493 (N.J. Super. Ct. App. Div. 1991).

The plain language of the Settlement Agreement is unambiguous, and does not bar Benchmark's claim against V3. As noted above, the Settlement Agreement released V3 from all claims that Benchmark "ha[s] or may have related to the BMC Claims and the Dispute, whether or not [it is] aware of any such claim." (Settlement Agreement ¶ 4.2.) The term "BMC Claims" is limited to Benchmark's claims for "certain paid-time off ("PTO") and severance expenses . . .

which were paid or owed to [Benchmark's] employees," and the "Dispute" is defined as the parties' disagreement "concerning the appropriateness of certain of the amounts or payments included in the BMC Claims." (Id. at 1.)

V3 argues that "the clear and unambiguous language" of the Agreement "settl[es] and releas[es] all claims between V3 and Benchmark arising from the disputed June 8, 2012 termination of the [Pre-Operating Agreement]." (Def. Mem. 8.) The Court disagrees. Count One of the instant complaint alleges that V3 "breached or materially breached the Pre-Opening Agreement when it wrongfully terminated the Pre-Opening Agreement by way of the Second Termination Notice" and when V3 "fail[ed] to pay Plaintiff the amounts due and owing thereunder." (Am. Compl. ¶¶ 32-33.) Through this action, Benchmark seeks "an award of actual damages, as well as special damages in the form of lost profits," attorney's fees and pre- and post-judgment interest. (Id. ¶¶ 35-38.)

The scope of the Settlement Agreement, on the other hand, was narrower. That Agreement only released V3 from claims concerning the paid-time off and severance payments for Benchmark's employees. The Settlement Agreement did not affect Benchmark's claim for damages and lost profits as a result of the alleged breach of the Pre-Operating Agreement itself. Accordingly, the Court finds that Benchmark's claim is not barred by the parties' limited Settlement Agreement. The Court next considers the merits of the breach of contract claim.

## 2.    Whether V3 Breached the Agreement

There is no dispute in this case about the first two elements required for a breach of contract claim under New York law—that is, the existence of an agreement and adequate performance by Benchmark. The parties contest whether V3 breached the Pre-Opening Agreement and, if so, whether Benchmark incurred damages.

The Second Termination letter stated that V3 was terminating the agreement because it had "determined in its sole discretion that the Project is not economically viable and ha[d] elected to sell the Building and Site."   (Cabañas Decl. Ex. 5)   This language tracked Section 10.2.12 of the Pre-Operating Agreement, which provided that "[i]f Owner in its sole discretion determines that the Project is not economically viable, Owner may terminate the development of the Project with the result that both this Agreement and the Hotel Management Agreement will terminate."  (Pre-Operating Agreement § 10.2.12.)

Although the contract vested "sole" discretion with V3 to determine whether development of the Hotel was "economically viable," under New York law, V3's discretion was not limitless.  "Even when a contract confers decision-making power on a single party, the resulting discretion is nevertheless subject to an obligation that it be exercised in good faith." Travellers Int'l, A.G. v. Trans World Airlines, Inc., 41 F.3d 1570, 1575 (2d Cir. 1994).  A contract that "contemplates the exercise of discretion . . . includes a promise not to act arbitrarily or irrationally in exercising that discretion."  Dalton v. Educ. Testing Serv., 87 N.Y. 2d 384, 389 (1995).  An act is "arbitrary" if it is made "without sound basis in reason and generally taken without regard to the facts."  Toledo Fund, LLC v. HSBC Bank USA, Nat'l Assn., No. 11 Civ. 7686, 2012 WL 2850997, at *6 (S.D.N.Y. July 9, 2012) (alteration omitted).

Applying these principles, the question becomes whether a jury could find that V3 acted "arbitrarily or irrationally" in determining that the Hotel was not economically viable.[3]  The Court concludes that a jury could so find.  Although Benchmark has not presented direct

---

[3]   Benchmark also asserts that in order for a termination to be valid under Section 10.2.12, V3 was first required to cease development of the Hotel.  Because the Hotel opened for business, Benchmark argues, V3 did not satisfy this condition.  Benchmark's contention is unavailing.  Paragraph 10.2.12 provides that "Owner may terminate the development of the Project with the result that both this Agreement and the Hotel Management Agreement will terminate."  The Agreement elsewhere defines "Project" as "the Land, hotel, and all other improvements and facilities to be constructed, furnished, or equipped thereon *by Owner*."  (Pre-Opening Agreement ¶ 1.35) (emphasis added).  By definition, development of the "Project" terminated when V3—the "Owner"—sold the land and other assets.

evidence of the Hotel's economic prospects (such as financial statements), circumstantial evidence could support an inference that V3's decision was not made in good faith. Viewed in the light most favorable to Benchmark, the evidence shows that V3 declared in its December 29, 2011 letter that development of the Hotel was not economically viable, (Cabañas Decl. Ex. 3), only to retract this statement three months (id. Ex. 4 at 3); that V3 subsequently sold the Hotel to a third party on June 8, 2012 (Decl. of Joseph Hyun Yi ¶ 2); and that the Hotel opened for business approximately two months later, (id. ¶ 3). While these facts by no means compel the conclusion that V3 acted in bad faith, they do not preclude such a conclusion, either. Accordingly, the Court denies both parties' motions for summary judgment on Count One.

B.      **Breach of Contract: Management Agreement**

Unlike the Pre-Opening Agreement, the Management Agreement did address the possibility that V3 would sell the Hotel.[4] Section 12.1(e) of the Management Agreement, entitled "Sale," provided: "If the Owner sells, assigns, transfers or otherwise disposes of Owner's title in the Building and the Site to any third party . . . Owner shall have the option, upon written notice to Operator, to terminate this Agreement . . . . Such written notice shall be given at least 70 days in advance and shall inform the Operator of the contract purchaser." (Management Agreement § 12.1(e).)

Benchmark asserts that V3 breached the contract by failing to give notice of the sale of the Hotel, and V3 concedes that it did not provide notice of the sale. (Def's Response to Pl. 56.1 Stmt. ¶ 36.) In V3's view, however, no notice was necessary—and no breach occurred—because the Management Agreement did not become effective until the Hotel's Opening Date; termination of the Pre-Operating Agreement, in V3's view, automatically terminated the

---

[4]      For the reasons described above, the parties' Settlement Agreement does not bar Benchmark's claim for breach of the Management Agreement: Benchmark seeks, *inter alia*, lost profits and recovery of the Termination Payment, two remedies that fall outside the scope of the Settlement Agreement's release.

Management Agreement.  (See, e.g., Def. Reply Mem. 15-16.)

The threshold question is thus whether an effective termination of the Pre-Operating Agreement also terminated the Management Agreement.  If so, the outcome of Count Two would depend entirely on the resolution Count One (that is, whether V3 determined in good faith that the Hotel was not economically viable), and summary judgment would be inappropriate.  If, however, the Management Agreement required separate termination by V3, then V3's only grounds for termination would be to invoke the "sale" clause, which required seventy days' notice—notice V3 admittedly did not provide.

To resolve this question, the Court begins by examining the text of the Management Agreement to determine whether, read "as a whole," there is a "reasonable basis for a difference of opinion."  Lockheed Martin Corp. v. Retail Holdings, N.V., 639 F.3d 63, 69 (2d Cir. 2011). On the one hand, certain sections of the Management Agreement suggest that the parties contemplated that its provisions governing termination would not take effect until the Hotel's Opening Date.  For example, the schedule setting out the Termination Payment began in "Year One," defined as the twelve-month period "commencing on the Opening Date."  (Addendum 2). Additionally, the section entitled "Original Term" provided that "[t]his Agreement shall continue for an initial term of ten (10) years commencing on the Opening Date unless terminated earlier in accordance with this Agreement."  (Management Agreement § 3.1.)  Because the contract was silent as to the effect of a termination before the Opening Date, one reasonable interpretation is that the parties contemplated that the Pre-Opening Agreement would govern their relationship before the Opening Date.  At the same time, however, the first sentence of the Management Agreement defined February 17, 2011—the date the parties signed the Agreement—as the "Effective Date."  (Management Agreement 1.)  Combined with the fact that the Management

14

Agreement made no mention of the Pre-Opening Agreement, one could also conclude that the Management Agreement had to be cancelled in its own right, regardless of whether it was terminated before Opening Date.

Because the Management Agreement is ambiguous, the Court next considers whether the ambiguity "may be resolved through extrinsic evidence that is itself capable of only one interpretation." Topps Co. v. Cadbury Stani S.A.I.C., 526 F.3d 63, 68 (2d Cir. 2008). Here, extrinsic evidence clearly defines the parties' intent. The Pre-Opening Agreement—signed on the same day as the Management Agreement—expressly provided that a termination for lack of economic viability would automatically terminate the Management Agreement. (Pre-Opening Agreement § 10.2.12; see also id. § 4.1.) Benchmark has not offered any other extrinsic evidence bearing on the parties' intent.

Therefore, if V3 determined in good faith that continued development of the Hotel was not "economically viable," its termination of the Management Agreement would be valid and it would not be liable for breach of contract. As described above, however, disputed issues of fact preclude the Court from finding whether V3 made such a good-faith determination regarding economic viability. Accordingly, the parties' cross-motions for summary judgment on Count Two are denied.

### C.     Breach of the Implied Covenant of Good Faith and Fair Dealing

Benchmark's third claim alleges that V3 breached the implied duty of good faith and fair dealing. This claim, which rests in large part on V3's refusal to pay a termination fee, does not make any factual allegations beyond those at issue in the two breach of contract claims.

Under New York law, "parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract." Cruz v.

FXDirectDealer, LLC, 720 F.3d 115, 125 (2d Cir. 2013).  A claim for breach of the duty of good faith and fair dealing is appropriate when "one party's conduct, though not breaching the terms of the contract in a technical sense, nonetheless deprived the other party of the benefit of the bargain."  CSI Inv. Partners II, L.P. v. Cendant Corp., 507 F. Supp. 2d 384, 425 (S.D.N.Y. 2007). "New York law does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." Cruz, 720 F.3d at 125 (alteration omitted).  Therefore, "when a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant." Id.

Benchmark alleges that "Defendant did not seek Plaintiff's consent prior to selling the Property and/or the Hotel to the [third party purchaser], wrongfully terminated the Amended Agreements, and then failed to pay Plaintiff the Termination Fee." (Am. Compl. ¶ 61.) Because this claim is "based on the same facts" as Benchmark's breach of contract claim, Cruz, 720 F.3d at 125, Count Three is dismissed.

### D.  Declaratory Judgment

Count Four of the amended complaint seeks a declaration that the Hotel was economically viable and that the Second Termination therefore did not terminate either the Pre-Opening Agreement or the Management Agreement.  (Am. Compl. ¶ 72.)  For the reasons described above, disputed issues of fact exist regarding whether V3 acted in good faith when it terminated the Agreements on the basis that the Hotel was not economically viable.  The Court thus denies summary judgment to either party on Count Four.

### E.  Motion to Strike

Benchmark also moves to strike twenty-seven statements or paragraphs contained within

16

the affidavit of Abraham Pasternak, the "agent for and chief advisor to defendant V3." (Pasternak Aff. ¶ 1.)  Benchmark asserts that each of these statements is inadmissible hearsay, improper legal argument, or a summary of a document that speaks for itself.

Affidavits made to support or oppose a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  "Only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment," and a "district court deciding a summary judgment motion has broad discretion in choosing whether to admit evidence."  Porter v. Quarantillo, 722 F.3d 94, 97 (2d Cir. 2013) (alteration omitted).

In adjudicating the parties' cross motions for summary judgment, the Court has not relied upon any portions of the Pasternak affidavit that Benchmark claims are inadmissible. Benchmark's motion to strike is therefore denied as moot.  See Borghese Trademarks Inc. v. Borghese, --- F.3d ----, 10 Civ. 5552, 2013 WL 143807, at *21 (S.D.N.Y. Jan. 14, 2013) (denying as moot a motion to strike when the "Court did not rely on any of the statements").

**F.  Conclusion**

Disputed issues of fact preclude the grant of summary judgment to either party on Counts One (breach of Pre-Opening Agreement), Two (breach of Management Agreement) and Four (declaratory judgment).  V3 is entitled to summary judgment on Count Three (breach of the duty of good faith and fair dealing).

Accordingly, V3's motion for summary judgment is GRANTED as to Count Three, but denied as to Counts One, Two, and Four.  Benchmark's cross motion for summary judgment is DENIED.  Benchmark's motion to strike portions of the Pasternak Affidavit is DENIED as

moot.

A telephone conference in this matter has been scheduled for Friday, October 4, 2013, at 3:30pm.  The parties shall jointly call Courtroom Deputy Allison Cavale at (212) 805-0162 at that time.

The Clerk of Court is respectfully directed to close the motions at docket numbers 6, 14, and 19.

SO ORDERED.

Dated:      September 27, 2013
            New York, New York


Ronnie Abrams
United States District Judge

18